## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| RUI ZHANG derivatively on behalf of THE GEO GROUP, INC., | |
| Plaintiff, | CASE NO. |
| v. | |
| GEORGE, C. ZOLEY, BRIAN R. EVANS, ANNE N. FOREMAN, DUANE HELKOWSKI, RICHARD H. GLANTON, JOSE GORDO, SCOTT M. KERNAN, GUIDO VAN HAUWERMEIREN, CHRISTOPHER C. WHEELER, JULIE MYERS WOOD, J. DAVID DONAHUE, ANN M. SCHLARB, and DAVID VENTURELLA, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| THE GEO GROUP, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Rui Zhang ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant The Geo Group, Inc. ("GEO" or the "Company") brings this Shareholder Derivative Complaint against Defendants George C. Zoley, Brian R. Evans, Duane Helkowski, Richard H. Glanton, Guido Van Hauwermieren, Christopher C. Wheeler, Anne N. Foreman, Scott M. Kernan, Julie M. Wood, Jose Gordo, J. David Donahue, Ann M. Schlarb, and David Venturella (collectively, the "Individual Defendants"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of their fiduciary duties, and unjust enrichment. Plaintiff alleges the following based upon personal knowledge as to all allegations concerning himself, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, (a) a review of the Company's

public documents; (b) transcripts of conference calls and announcements made by the Company and Individual Defendants; (c) the Company's filings with the United States Securities and Exchange Commission ("SEC"); (d) news reports, securities analysts' reports and advisories about the Company; and (e) public filings in the related federal securities class action lawsuit, pending in this District Court, captioned *Hartel v. The GEO Group, Inc.*, *et al.*, Case No. 20-CV-81063 (S.D. Fla.) (the "Securities Action"), including the decision in that case denying defendants' motion to dismiss in part. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of GEO against the Individual Defendants for violations of law that occurred between November 7, 2018, to August 5, 2020 (the "Relevant Period"), which caused and continues to cause substantial harm to GEO and its shareholders.

2.      GEO is an integrated equity real estate investment trust ("REIT") and a leading provider of evidence-based offender rehabilitation and community reentry services in the United Kingdom, United States, South Africa, and Australia. GEO's operations include the management and/or ownership of halfway houses and other facilities in the United States.

3.      The Individual Defendants knew the Company operated in a highly regulated industry. As a REIT, GEO maintained limited funds with which to run its operations and had to rely on the capital markets to fund growth investments. Accordingly, GEO's continued success depended on lucrative financing deals with large banks like JPMorgan Chase Co. ("JPMorgan"), Wells Fargo & Company ("WF"), and Bank of America Corporation ("BofA"), which, in turn, required GEO to comply with a host of legal and regulatory requirements.

4.     Due to intense public scrutiny regarding its operational deficiencies, GEO misrepresented that its association with these banking institutions remained unwavering. To the contrary, a majority of GEO's financial partners severed their relationship with the Company.

5.     This complaint arises from GEO misrepresenting its financial dealings with these conglomerate banking institutions and certain government contracts. As described in detail below, GEO was expending vast sums of money to defend a series of class action lawsuits which impaired the Company's ability to fulfill its contractual obligations with counties in California, New Mexico, and Delaware, which were at substantial risk of being terminated.

6.     Despite the uncertainty surrounding GEO's ability to obtain funding, the Company continued to assure its investors of the stability of its cash flow and receipt of dividends. Without cash liquidity from financial institutions, GEO was unable to effectively respond and manage the COVID-19 pandemic in its facilities. In turn, GEO endangered residents and employees of the Company's facilities to significant health risks as the COVID-19 pandemic progressed, resulting in numerous deaths.

7.     As detailed below, the Individual Defendants repeatedly caused the Company to misrepresent the stability of their cash flows and dividend payments, as a direct result of their deteriorating relationship with financial institutions and lapse of multiple government contracts. The Individual Defendants knew or were reckless in not knowing that the Company misrepresented and failed to disclose that a series of class action lawsuits was a possible "catastrophic risk" to the Company and exposed GEO to "tens of millions" in potential damages and as much as $20 million in legal expenses. For example, Individual Defendant George C. Zoley ("Zoley") stated privately that the multiple class actions against the Company posed "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and to

continue receiving revenue from those facilities. Indeed, Zoley indicated to U.S. Immigration and Customs Enforcement ("ICE") that he was "deeply alarmed" about the "tens of millions" in potential damage exposure and the "rapidly increasing" expenses to defend the lawsuits, estimating in May 2018 that the cost could be as much as $20 million. That considerable financial exposure would erode GEO's net income, which in 1Q18, for example, had been only $34.9 million. In other words, the amount of liability faced by GEO could immediately eradicate 57% of GEO's quarterly profit. Indeed, Defendant Zoley was right to be "deeply alarmed." There was an existential threat to GEO's profitability and dividends. Worse yet, the pressures and exposure that GEO faced as of May 2018 were growing more severe.

8.      By August 2019, eight banks publicly announced they would no longer fund private prisons. On November 5, 2019, Individual Defendants caused the Company to state that there was "misinformation regarding [their] banking partners and access to capital" and continued to misrepresent that their dividend payments would remain "unchanged."

9.      The Individual Defendants caused the Company to admit that due to its success as a leading service provider, GEO was capable of offering "higher quality of care for individuals." On April 30, 2020, Individual Defendants caused the Company to admit that some of their residents had COVID-19 and assured investors that GEO would be taking "comprehensive steps to address and mitigate the risk of COVID-19." The Individual Defendants continued to assure the public that the health, welfare, and safety of their residents and staff members was their "number one priority."

10.      A month later, the Company issued guidance as to how GEO would navigate and combat the challenges that COVID-19 presented, such as inter alia procuring additional personal protective equipment, implementing quarantine and cohorting procedures to isolate confirmed and

presumptive cases of COVID-19, and educational guidance regarding hygienic precautions. On June 1, 2020, the Individual Defendants caused GEO to release a statement touting that all of the Company's facilities were "operating safely and without overcrowded conditions."

11.     Approximately three weeks later, on June 17, 2020, the Individual Defendants' wrongful conduct came to light when The Intercept published an article detailing GEO's unsuccessful response to the global pandemic. The article reported that there was a significant COVID- 19 outbreak at the Grossman Center, a halfway house in Leavenworth, Kansas, operated by GEO. The article stated that the Grossman Center was one of the "hardest hit federal halfway house in the country" regarding confirmed cases of COVID-19. The article further claimed that the spike in COVID-19 cases was due to GEO overcrowding its facilities without enforcing the health and safety protective measures.

12.     On August 6, 2020, the full truth was revealed. Media news outlets reported GEO's conscious disregard of properly testing individuals for COVID-19 at its facilities in order to avoid implementing proper safety measures. Later that day, GEO announced a nearly 30% reduction in its quarterly dividend from $0.48 per share to $0.34 per share–enough for GEO to remain structured as a publicly traded REIT. In response to GEO's callous method and protocol for inmate wellness in the face of COVID-19 and announcing the dividend cut, GEO's stock price fell $0.77 per share, or nearly 7%, to close at $10.67 per share on August 7, 2020, after two days of heavy trading.

13.     As a result of the foregoing, GEO, its current chief executive officer ("CEO") George C. Zoley, and current chief financial officer ("CFO") Brian R. Evans have been named as defendants in the Securities Action (the "Securities Defendants"), which alleges investors were damaged when they purchased GEO shares during the Relevant Period.

14.     On September 23, 2021, the court in the Securities Action denied the Securities Defendants' Motion to Dismiss in part (the "Securities Action Opinion," see Dkt. No. 45) and held plaintiffs adequately alleged defendants' statements concerning pending lawsuits were false and misleading when made. (Id. at 22). The court also found plaintiffs "adequately pled scienter as to GEO's statements about the potential costs of the lawsuits against GEO" because, among other reasons, Individual Defendant Zoley privately wrote to regulators that the lawsuits represented a "potentially catastrophic risk" to the Company – notwithstanding his public representations to the contrary (Id. at 25). The court concluded this was "sufficient to create a strong inference that Defendants GEO and Zoley acted with an intent to deceive or with severe recklessness." (Id. at 26). On October 4, 2021, plaintiffs filed a Second Amended Complaint. (Dkt. No. 46).

15.     The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. The Individual Defendants' wrongful conduct will likely cost the Company millions of dollars going forward.

16.     On January 25, 2021, Plaintiff sent a letter to the GEO Board of Directors (the "Board") demanding that the Board investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors (the "Demand").[1]  Pursuant to Florida statute, Plaintiff may bring a derivative action 90 days after the Demand was sent.

17.     On February 3, 2021, GEO's counsel wrote a letter to Plaintiff's counsel, confirming receipt of the Demand and that they would provide a response following review of the

_____

[1] A true and complete copy of the Demand is attached hereto as Exhibit A.

Demand (the "GEO Letter").[2]  On April 19, 2021, GEO's counsel wrote a  response to Plaintiff's counsel, stating that its counsel would not consider the Demand because the issues in the Demand are the Securities Action (the "GEO Response").[3] As such, Plaintiff has not received a substantive response to the Demand or date on which the purported investigation would be completed. Accordingly, as further detailed herein, the Demand in this case was refused.

18.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending and paying class-wide damages in the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

<u>**JURISDICTION AND VENUE**</u>

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

21.     This Court has jurisdiction over each Defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an individual residing in this District, and/or is an individual non-resident who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

---

[2] A true and complete copy of the GEO Letter is attached hereto as Exhibit B.

[3] A true and complete copy of the GEO Response is attached hereto as Exhibit C.

22.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (a) GEO maintains its principal place of business in this District; (b) one or more of the Defendants either resides in or maintains offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

23.     Plaintiff, Rui Zhang, is a current shareholder of GEO common stock. Plaintiff has continuously held GEO common stock since February 2018.

**Nominal Defendant**

24.     Nominal Defendant, GEO, is a Florida corporation with its principal executive offices located at 4955 Technology Way, Boca Raton, Florida 33431.

25.     GEO stock trades on the NASDAQ under the ticker symbol "GEO."

**Defendant Zoley**

26.     Defendant Zoley ("Zoley") is GEO's founder, CEO until July 1, 2021, and Chairman of the Board (1988- Present). Additionally, he served as Vice Chairman and Chief Executive Officer (1997-2002). According to the Company's Schedule 14A filed with the SEC on March 19, 2021, Zoley beneficially owned 3,254,852 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 19, 2021, Zoley beneficially owned $26,461,946.76 of GEO stock. This amount does not include 642,118 shared by a rabbi trust for the benefit of Mr. Zoley pursuant to the amended and restated executive retirement agreement.

8

27.     For the fiscal year ended December 31, 2020, Defendant Zoley received $2,041,894 in compensation from the company. This includes $1,170,331 salary, $2,452,500 in stock awards, $1,755,467 in non-equity incentive plan compensation, $53,449 in all other compensation, and a loss totaling $3,389,833 related to exchanging a "fixed" retirement amount for an "at-risk" retirement amount tied to the shares of GEO common stock pursuant to the 2020 Amended and Restated Agreement as a result of the decline in GEO's common stock during the year ended December 31, 2020.

28.     The Company's 2021 Proxy Statement stated the following about Defendant Zoley:

Mr. Zoley is GEO's Chairman of the Board, Chief Executive Officer and Founder. He served as GEO's Vice Chairman and Chief Executive Officer from January 1997 to May of 2002. Mr. Zoley has served as GEO's Chief Executive Officer since the company went public in 1994. Prior to 1994, Mr. Zoley served as President and Director since GEO's incorporation in 1988. Mr. Zoley founded GEO in 1984 and continues to be a major factor in GEO's development of new business opportunities in the areas of correctional and detention management, community reentry, electronic monitoring, offender rehabilitation, and other diversified government services. Mr. Zoley also serves as a director of several business subsidiaries through which The GEO Group, Inc. conducts its operations worldwide.

Mr. Zoley has bachelor's and master's degrees in Public Administration from Florida Atlantic University (FAU) and a Doctorate Degree in Public Administration from Nova Southeastern University (NSU). For seven years, Mr. Zoley served as a member of the Board of Trustees of Florida Atlantic University in Boca Raton, Florida, and previously served as Chairman of the Board of Trustees. Mr. Zoley was born in Florina, Greece and was the recipient of the Ellis Island Medal of Honor in 2002.

As GEO's founder, his knowledge, experience, and leadership are invaluable to the operation and development of the company. His more than 35 years with the company make him uniquely qualified to be GEO's Chairman of the Board and Chief Executive Officer.

**Defendant Evans**

29.     Defendant Brian R. Evans ("Evans") is and was at all relevant times senior Vice President ("VP") and Chief Financial Officer ("CFO"). According to the Company's 2021 Proxy Statement filed on March 19, 2021, Defendant Evans beneficially owned 251,793 shares of the

Company's stock.  Based upon the closing price of the Company's common stock on March 19, 2021, Evans beneficially owned $2,047,077.09 of GEO stock.

30.    For the fiscal year ended December 31, 2020, Defendant Evans received $2,417,253 in compensation from the company. This includes $639,416 salary, $817,500 in stock awards, $479,562 in non-equity incentive plan compensation, $458,169 in compensation earnings, and $22, 606 in all other compensation.

31.    The Company's 2021 Proxy Statement stated the following about Defendant Evans:

Brian R. Evans joined GEO in 2000 and has over 20 years of business management experience. Since joining the company, Mr. Evans has served in increasingly senior business management positions including as Vice President of Finance, Chief Accounting Officer, and Controller and was named GEO's Senior Vice President and Chief Financial    Officer in 2009.

As Chief Financial Officer, Mr. Evans is responsible for the overall financial management of GEO and its subsidiaries and the Company's acquisition and growth initiatives. Since joining the Company, Mr. Evans has overseen significant financial growth and shareholder value creation.

During his tenure at GEO, Mr. Evans has been instrumental in successfully executing the  Company's strategy for three secondary public offerings of equity; the execution of multiple financing transactions; and the successful completion of major business transactions including the acquisitions of Correctional Services Corporation in 2005,  CentraCore Properties Trust in 2007, Cornell Companies in 2010, BI Incorporated in 2011, LCS Corrections in 2014 and Community Education Centers in 2017. Mr. Evans was also instrumental in GEO's highly successful conversion to a Real Estate Investment Trust in 2013.

Prior to joining GEO, Mr. Evans worked for Arthur Andersen LLP as a Manager in the   Audit and Business Advisory Services Group from 1994 until joining GEO. During his     tenure at Arthur Andersen, Mr. Evans supervised the financial statement audits of both        public and private companies and city and county governments. From 1990 until 1994, Mr. Evans served as an Officer in the Supply Corps of the United States Navy and was     assigned to the USS Monterey in Jacksonville, Florida.

Mr. Evans graduated in 1990 from the University of Notre Dame with a Bachelor's Degree in Accounting. Mr. Evans is a member of the American Institute of Certified Public Accountants.

**Defendant Foreman**

32.     Defendant Anne N. Foreman ("Foreman") is and was at all relevant times a director of GEO (2002- Present). According to the Company's 2021 Proxy Statement filed on March 19, 2021, Foreman beneficially owned 27,836 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 19, 2021, Foreman beneficially owned $226,306.68 of GEO stock.

33.     For the fiscal year ended December 31, 2020, Defendant Foreman received $209,501 in compensation from the Company. This includes $123,125 salary and $86,376 in stock awards.

34.     The Company's 2021 Proxy Statement stated the following about Defendant Foreman:

> Ms. Foreman has served as a director of GEO since 2002. Since 1999, Ms. Foreman has been a court appointed trustee and is Trust Chair of the National Gypsum Company Bodily Injury Trust, a trust created for the purpose of resolving asbestos related bodily injury liabilities. Ms. Foreman served as Under Secretary of the United States Air Force from September 1989 until January 1993. Prior to this appointment, Ms. Foreman was General Counsel of the Department of the Air Force, a member of the Department's Intelligence Oversight Board and the Department's Chief Ethics Officer. She practiced law in the Washington office of Bracewell and Patterson and the London office of Boodle Hatfield, Co. from 1979 to 1985. Ms. Foreman is a former member of the U.S. Foreign Service, and served in Beirut, Lebanon; Tunis, Tunisia; and the U.S. Mission to the U.N. Ms. Foreman earned a bachelor's degree, magna cum laude, in history and French, and a master's in history from the University of Southern California in Los Angeles. She holds her juris doctor, cum laude, from American University in Washington, D.C. Ms. Foreman served on the board of Trust Services, Inc. beginning in 1999 and has served as chair since 2009. Ms. Foreman also served on the Board of The Wackenhut Corporation from 1993 to 2002, a then publicly-traded security and corrections corporation, for nine years. Ms. Foreman has served on the board of directors of Ultra Electronics Defense, Inc. (UEDI), a US holding company owned by the publicly-traded UK corporation, Ultra Electronics, Plc., a specialist electrical and electronics engineering company.
>
> Ms. Foreman brings extensive legal, government contracting and international experience to the board of directors. Her experience as a board member of other companies strengthens the board of directors' collective knowledge, capabilities and experience.

11

**Defendant Helkowski**

35.     Defendant Duane Helkowski ("Helkowski") was appointed as a director on July 8, 2020, and served on the Board until her resignation in July 2021.

36.     For the fiscal year ended December 31, 2019, Defendant Helkowski received $53,750 in compensation from the Company.

37.     The Company's 2021 Proxy Statement stated the following about Defendant Helkowski:

> Mr. Helkowski has over 30 years of experience in advising companies with respect to lending and capital markets transactions. Since July 2019, Mr. Helkowski has been serving as a strategic advisor to several small and mid-size businesses with respect to the debt capital markets and mergers and acquisitions. Mr. Helkowski was an investment banker with BNP Paribas from March 1995 until he retired on July 1, 2019, including serving most recently as the Sector Industry Head for REITS, Gaming/Leisure and Homebuilders from 2002-2019. Prior to joining BNP Paribas, Mr. Helkowski worked for ABN AMRO Bank (now a division of the Royal Bank of Scotland) from June 1988 to March 1995, including serving as an Internal Auditor, Senior Credit Analyst and Assistant Vice President and Lending Officer. Mr. Helkowski obtained formal credit training from Chase Bank in 1991, including audit related classes. Mr. Helkowski has also obtained the following FINRA certifications: Series 7, Series 24, Series 63 and Series 79. He received a Bachelor of Science degree in Finance from Villanova University and a Master of Business Administration in International Banking and Finance from Hofstra University.

> Mr. Helkowski brings extensive investment banking experience advising REITs and other companies on lending and capital markets transactions. His investment banking experience will strengthen the board of directors' collective knowledge, capabilities and experience.

**Defendant Glanton**

38.     Defendant Richard H. Glanton ("Glanton") is and was at all relevant times a director of GEO (1998- Present). According to the Company's 2021 Proxy Statement filed on March 19, 2021, Glanton beneficially owned 15,013 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 19, 2021, Glanton beneficially owned $122,055.69 of GEO stock.

12

39.     For the fiscal year ended December 31, 2020, Defendant Glanton received $281,376 in compensation from the Company. This includes $195,000 in salary and $86,376 in stock awards.

40.     The Company's 2021 Proxy Statement stated the following about Defendant Glanton:

> Mr. Glanton has served as a director of GEO since 1998. Mr. Glanton is the Founder and has served as Chairman, and Chief Executive Officer of Electedface Inc., a website that connects voters to the elected and appointed officials who represent them in political districts where they serve. Mr. Glanton was Senior Vice President of Corporate Development at Exelon Corporation from 2003-2008. From 1983 to 2003, he was a Partner at Wolf Block LLP (1983-86) and at Reed Smith LLP (1986-2003). From 1990 to 1998, he served as President of the Barnes Foundation in Merion, Pennsylvania, a foundation established to promote education and the appreciation of fine arts and horticulture. Mr. Glanton is a member of the board of directors and Chairman of the Compensation Committee of Mistras Group, Inc., a publicly traded company providing technology-enabled asset protection solutions used to evaluate the structural integrity of energy, industrial and public infrastructure. Mr. Glanton served as a director of Aqua America, Inc., the second-largest publicly traded water utility based in the U.S., from 1995 to 2018, including as Lead Independent Director and a member of the Executive Committee. He received his bachelor's degree in English from the University of West Georgia in Carrollton, Georgia and his juris doctor from the University of Virginia School of Law in Charlottesville, Virginia. On July 13, 2017, Mr. Glanton filed for personal bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. Mr. Glanton filed a proposed reorganization plan on December 5, 2017. On March 8, 2018, Mr. Glanton filed a motion for the voluntary dismissal of the bankruptcy case and an order granting such motion was entered on April 27, 2018.

> Mr. Glanton's experience in utility acquisitions, his experience as a director of other publicly-traded companies and his demonstrated leadership roles in other business activities are important qualifications for the board of directors. His extensive corporate finance and legal knowledge also contribute to the board of directors' collective knowledge, capabilities and experience.

**Defendant Gordo**

41.     Defendant Jose Gordo ("Gordo") is GEO's CEO and was appointed as a director of the Company in 2019. According to the Company's 2021 Proxy Statement filed on March 19, 2021, Gordo beneficially owned 5,462 shares of the Company's stock.  Based upon the closing

price of the Company's common stock on March 19, 2021, Gordo beneficially owned $44,406.06 of GEO stock.

42.     For the fiscal year ended December 31, 2020, Defendant Gordo received $203,876 in compensation from the Company. This includes $117,500 in salary and $86,376 in stock awards.

43.     The Company's 2021 Proxy Statement stated the following about Defendant Gordo:

> Mr. Gordo has over 20 years of experience in business management, private equity, corporate finance and business law. Since June 2017, Mr. Gordo has served as the Managing Partner of a general partnership that invests in and actively oversees small and medium-sized privately held companies, with a focus on the healthcare, technology and financial services industries. From 2013 to early 2017, Mr. Gordo served as the Chief Financial Officer of magicJack Vocaltec Ltd., a publicly-traded company in the telecommunications industry. Prior to that position, Mr. Gordo served as a Managing Director at The Comvest Group, a Florida-based private equity firm. Mr. Gordo was also previously a partner at the national law firm of Akerman LLP, where he specialized in corporate law matters, advising public and private companies and private equity firms on mergers and acquisitions and capital markets transactions. He received a J.D. degree from Georgetown University Law Center and a B.A. degree from the University of Miami.
>
> Mr. Gordo brings extensive experience in business management, finance, corporate strategy, operations and business law to the Board of Directors. His expertise in these areas and his deep understanding of GEO and its industry will strengthen the board of directors' collective knowledge, capabilities and experience.

**Defendant Kernan**

44.     Defendant Scott Kernan ("Kernan") is and was at all relevant times a director of GEO (2018- Present). According to the Company's 2021 Proxy Statement filed on March 19, 2021, Kernan beneficially owned 14,440 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 19, 2021, Kernan beneficially owned $117,397.20 of GEO stock.

45.     For the fiscal year ended December 31, 2020, Defendant Kernan received $187,001 in compensation from the Company. This includes $100,625 in salary and $86,376 in stock awards.

46.     The Company's 2021 Proxy Statement stated the following about Defendant

Kernan:

> Mr. Kernan has served as a director of GEO since September 2018. Mr. Kernan
> served as the Agency Secretary of the California Department of Corrections and
> Rehabilitation ("CDCR") from January 2016 until August 2018. Prior to that time,
> Mr. Kernan was appointed the Undersecretary of Operations of CDCR beginning
> in September 2008 and served in that position until retiring in October 2011. In
> March of 2015, Mr. Kernan returned to the Undersecretary position from his
> retirement at the request of California Governor Jerry Brown and worked in that
> capacity until January 2016. From October 2011 until March 2015, Mr. Kernan
> owned his own independent consulting firm that specialized in corrections and
> criminal justice. From March 2007 to September 2008, Mr. Kernan served as the
> Chief Deputy Secretary of Adult Operations of CDCR. Prior to that time,
> Mr. Kernan served as the Deputy Director of the Division of Adult Institutions of
> CDCR from May 2006 to March 2007. From November 2004 to May 2006,
> Mr. Kernan served as the Warden of the California State Prison, Sacramento, a
> Level IV maximum-security institution. From October 2003 to November 2004,
> Mr. Kernan served as the Warden of the Mule Creek State Prison, a Level III/IV
> institution. From March 1983 to October 2003, Mr. Kernan held various
> correctional positions with CDCR.
>
> Mr. Kernan's brings invaluable expertise with the California Department of
> Corrections and Rehabilitation. His industry knowledge and experience will
> strengthen the board of director's collective knowledge, capabilities and
> experience.

**Defendant Van Hauwermeiren**

47.     Defendant Guido Van Hauwermeiren ("Van Hauwermeiren") was appointed as a

director of the Company in 2019 and served on the Board until his resignation in July 2021.

According to the Company's 2021 Proxy Statement filed on March 19, 2021, Van Hauwermeiren

beneficially owned 14,440 shares of the Company's stock.  Based upon the closing price of the

Company's common stock on March 19, 2021, Gordo beneficially owned $117,397.20 of GEO

stock.

48.     For the fiscal year ended December 31, 2020, Defendant Van Hauwermeiren

received $205,126 in compensation from the Company. This includes $118,750 in salary and

$86,376 in stock awards.

15

49.     The Company's 2021 Proxy Statement stated the following about Defendant Van Hauwermeiren:

> Mr. Van Hauwermeiren has served as a director of GEO since July 2018. Mr. Van Hauwermeiren is currently the Head of Coverage and Investment Banking — Americas for Societe Generale after joining in 2014. Prior to joining Societe Generale, Mr. Van Hauwermeiren served as the Head of Internal Coverage of BNP Paribas from 2006 to 2014 and a member of the Executive Board of BNP Paribas CIB Paris. Mr. Van Hauwermeiren was Co-Head of Emerging Markets and a member of the International Retail Management Committee of BNP Paribas from 2007 to 2009 and Head of Eurasia — North Africa Region and a member of the Executive Committee at the Cetelem consumer finance division of BNP Paribas from 2006 to 2007. Previously, Mr. Van Hauwermeiren worked for Credit Lyonnais and Calyon Americas from 1992 to 2006 during which time he led coverage teams with responsibility for the United Kingdom, Ireland, Milan, Mexico and Central America, the Midwest/Chicago region of the United States, and Western Europe, Israel and South Africa. Prior to that time, Mr. Van Hauwermeiren worked for Banco Provincial Saica Saca in Venezuela from 1987 to 1991 as Head of Coverage for large multinationals. Mr. Van Hauwermeiren earned a Bachelor of Science degree in Economics at Spring Hill College in Mobile, Alabama and a Master of Business Administration from the Instituto de Estudios Superiores de Administracion (IESA) in Caracas, Venezuela.
>
> Mr. Van Hauwermeiren brings extensive global investment banking experience to the board of directors. His global investment banking experience will strengthen the board of director's collective knowledge, capabilities and experience.

**Defendant Wheeler**

50.     Defendant- Christopher C. Wheeler ("Wheeler") is and was at all relevant times a director of GEO (2010- Present). According to the Company's 2021 Proxy Statement, filed on March 19, 2021, Wheeler beneficially owned 39,634 shares of the Company's stock. Based upon the closing price of the Company's common stock on March 19, 2021, Gordo beneficially owned $322,224.42 of GEO stock.

51.     For the fiscal year ended December 31, 2020, Defendant Wheeler received $189,501 in compensation from the Company. This includes $103,125 in salary and $86,376 in stock awards.

52.     The Company's 2021 Proxy Statement stated the following about Defendant Wheeler:

> Mr. Wheeler has served as a director of GEO since 2010. Mr. Wheeler retired from Proskauer Rose LLP in January 2010, where he served as a member of the Corporate Department and a partner in the firm's Florida office for nearly 20 years. Mr. Wheeler has had extensive experience in real estate and corporate law, institutional lending, administrative law and industrial revenue bond financing. He has acted as counsel for developers, institutions and large property holders in connection with the purchase, sale, refinancing or operation of real estate properties. Mr. Wheeler is a graduate of Hamilton College and Cornell Law School and was a member of the managing Board of Editors of the Cornell Law Review. Active in professional, charitable and philanthropic matters and community affairs, Mr. Wheeler presently serves on the Board of Trustees of the Boca Raton Regional Hospital and BRRH Corporation, the parent organization for Boca Raton Regional Hospital. He is a former member of the Board of Directors of Pine Crest Preparatory School, the Board of Directors of Ronald McDonald House Charities of South Florida, and the Board of Directors of the Florida Atlantic University Foundation.
>
> Mr. Wheeler also served as a member of the Grievance Committee for the Fifteenth Judicial Circuit of Florida. Mr. Wheeler brings extensive real estate, finance and legal knowledge to the board of directors. His credentials in lending and bond financing strengthens the board of directors' collective knowledge, capabilities and experience.

**Defendant Wood**

53.     Defendant Julie Myer Wood ("Wood") was appointed as a director of the Company in 2019. According to the Company's 2021 Proxy Statement filed on March 19, 2021, Wood beneficially owned 32,026 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 19, 2021, Wood beneficially owned $260,371.38 of GEO stock.

54.     For the fiscal year ended December 31, 2020, Defendant Wood received $194,501 in compensation from the Company. This includes $108,125 in salary and $86,376 in stock awards.

55.     The Company's 2021 Proxy Statement stated the following about Defendant Wood:

> Ms. Wood has served as a director of GEO since 2014. She is currently the Chief Executive Officer of Guidepost Solutions LLC ("Guidepost"), a company specializing in monitoring, compliance, international investigations and risk

management solutions, after joining the organization in 2012 as president of its Compliance, Federal Practice and Software Solutions division. Prior to joining Guidepost Solutions, Ms. Wood was the former founder and president of ICS Consulting, LLC, a firm specializing in compliance, risk assessments, immigration and customs investigations from November 2008 until September 2012 when it was acquired by Guidepost. Ms. Wood regularly conducts government contracting, immigration and anti-corruption due diligence risk assessments, develops cross-functional compliance monitoring programs and conducts third-party regulatory audits. Ms. Wood also has significant experience as a government-appointed monitor. Prior to joining the private sector, Ms. Wood served as the Head of Immigration and Customs Enforcement ("ICE") for the Department of Homeland Security ("DHS") from January 2006 until November 2008 leading its largest investigative component and the second largest investigative agency in the federal government. Ms. Wood's previous leadership positions in the federal government include Assistant Secretary for Export Enforcement at the Department of Commerce, Chief of Staff for the Criminal Division at the Department of Justice and Deputy Assistant Secretary (Money Laundering and Financial Crimes) at the Treasury Department. Ms. Wood served as an Assistant U.S. Attorney for the Eastern District of New York. Prior to government service, Ms. Wood was an associate at Mayer, Brown & Platt in Chicago, Illinois. In addition to serving as CEO, Ms. Wood sits on the Board of Directors of Guidepost Solutions LLC and its parent company, Solution Point International.

Ms. Wood brings extensive federal government, legal and management experience to the board of directors. Her experience in the private sector, including in compliance and risk assessments, and her former government positions, including as Head of Immigration and Customs Enforcement, strengthens the board of directors' collective knowledge, capabilities and experience.

**Defendant Donahue**

56. Defendant J. David Donahue ("Donahue") was at all relevant times senior Vice President ("VP") and Chief Financial Officer ("CFO") of the Company (2016-Present). As of July 11, 2020, Defendant Donahue retired from his position as senior VP of GEO Secured Services.

**Officer Defendants**

57. Ann M Schlarb ("Schlarb") joined GEO in 2011 as Vice President of Intensive Supervision and Appearance Program Services, and is currently Senior Vice President, President GEO Care.

58.     David Venturella ("Venturella") joined GEO in 2012 as Executive Vice President, Corporate Development, and is currently the Company's Senior Vice President, Client Relations.

**Relevant Non-Parties**

59.     On July 9, 2021, non-party Terry Mayotte was appointed to the Board.

60.     On July 9, 2021, non-party Jack Brewer was appointed to the Board.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

61.     By reason of their positions as officers, directors and/or fiduciaries of GEO and because of their ability to control the business and corporate affairs of GEO, the Individual Defendants owed GEO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage GEO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GEO and its shareholders to benefit all shareholders equitably.

62.     Each director and officer of the Company owes GEO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

63.     As fiduciaries of GEO, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

64.     The officers and directors of GEO were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

65.     Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care,

and diligence in the management and administration of the affairs of the Company. As GEO's directors and officers, the Individual Defendants knowingly acted with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

66.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

67.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things the Individual Defendants were required to:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida, the United States, and pursuant to GEO's Code of Conduct and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how GEO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to

make a reasonable inquiry in connection in addition to that, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic, accurate records and reports of the business and internal affairs of GEO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GEO's operations would comply with all laws and GEO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.     Each of the Individual Defendants further owed GEO and GEO's shareholders the duty of loyalty requiring that each favor GEO's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Individual Defendants were the agents of each other and GEO and were at all times acting within the course and scope of such agency.

70.     The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial positions with GEO.

71.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GEO.

## GEO's Code of Conduct

72.     GEO's published code of business conduct (the "Code of Conduct") includes "[o]beying the law, both in letter and in spirit." GEO's Code of Conduct strives to promote the following objectives: inter alia, honest and ethical conduct, ethical handling of apparent and actual conflicts of interest, and full, fair, accurate, timely, and understandable disclosure.

73.     The Code of Conduct stated the following regarding "Account Policies and Disclosures[:]"

> All directors, officers, employees and other persons are prohibited from directly or indirectly falsifying or causing to be false or misleading any financial or accounting book, record or account. You and others are expressly prohibited from directly or indirectly manipulating an audit, and from destroying or tampering with any record, document or tangible object with the intent to obstruct a pending or contemplated audit, review or federal investigation. The commission of, or participation in, one of these prohibited activities or other illegal conduct will subject the perpetrator to federal penalties, as well as punishment of up to and including termination of employment.
>
> No director, officer or employee of GEO may (1) directly or indirectly make or cause to be made a materially false or misleading statement, or (2) omit to state, or cause another person to omit to state, any material fact necessary to make statements made not misleading in connection with the audit of financial statements by independent accountants, the preparation of any required reports whether by

22

independent or internal accountants, or any other work which involves or relates to the filing of a document with the Securities and Exchange Commission (SEC). GEO's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules. Each director, officer or employee who is involved in GEO's disclosure process must: (1) be familiar with and comply with GEO's disclosure controls and procedures and its internal control over financial reporting; (2) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of GEO provide full, fair, accurate, timely and understandable disclosure.

74.     The Code of Conduct instructs GEO's employees to follow guidelines regarding

reporting illegal and unethical behavior:

Actions prohibited by this Code involving directors or executive officers must be reported to the Audit and Finance Committee. Actions prohibited by this Code involving any other person must be reported to the Office of Professional Responsibility. After receiving a report of an alleged prohibited action, the Audit and Finance Committee or the Office of Professional Responsibility must promptly take all appropriate actions necessary to investigate. Employees are encouraged to talk to supervisors, managers or other appropriate personnel about observed illegal or unethical behavior and when in doubt about the best course of action in a particular situation. All directors, officers and employees are expected to cooperate in internal investigations of misconduct. Employees must read GEO's policy on Employee Complaint Procedures for Accounting and Auditing Matters, which describes GEO's procedures for the receipt, retention, and treatment of complaints received by GEO regarding accounting, internal accounting controls, or auditing matters. Any employee may submit a good faith concern regarding accounting or auditing matters without fear of dismissal or retaliation of any kind. Nothing in GEO's policy or Employee Complaint Procedures for Accounting and Auditing Matters is meant to restrain whistleblowers from communicating with the SEC or violate Rule 21F-17 under the Securities Exchange Act of 1934. Please also refer to Section 19 relating to the Special Code of Ethics for the CEO, Senior Financial Officers and Other Employees.

75.     GEO's Code of Conduct also sets a specific code of ethics that senior financial

officers and other employees must adhere to:

All of GEO's employees, including the CEO and all senior financial officers, including the principal financial officer, the principal accounting officer and controller and persons performing similar functions, are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by GEO with the SEC. Accordingly, it is the responsibility of all employees of GEO to promptly report any untrue statement of material fact and any omission of material fact of which they may become aware pertaining to information

23

prepared by him or her or associates in his or her area(s) of responsibility that affect the disclosures made by GEO in its public filings.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (a) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (b) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (c) artificially inflate the Company's stock price.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. Each of the Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and GEO and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### Background

81.     GEO owns and maintains over 100 U.S. prison facilities with nearly 100,000 corrections and detention beds and is the largest provider of youth and electronic monitoring services and community correction in the U.S. In 2017, 23% of the Company's revenue came from GEO Care, the division of the Company that handles these products and services. The Company has had a long-standing partnership with the federal government spanning three decades.

82.     GEO is devoted to offering rehabilitation programs to individuals while in-custody and post-release into the community through the "GEO Continuum of Care TM." The program is an enhanced in-custody offender rehabilitation program, that offers integrated post-release support services, cognitive behavioral therapy, and complementary turn-key solutions for numerous government partners worldwide. The objective of the program is to facilitate a successful transition to life at home, continue offender treatment at a day reporting center, and maximize the impact of the program to decrease the likelihood of recidivism.

83.     On December 31, 2012, GEO accomplished a significant milestone with the completion of the legal and organizational restructuring of its diversified business units, allowing GEO to become the first fully integrated equity REIT in the correctional and detention industry. The REIT structure allows GEO to maximize the Company's ability to create shareholder value, decrease capital costs, and expand a larger pool of prospective shareholders. Additionally, there was substantial room to expand because the U.S. had the largest prison population in the world and private prisons represented less than 10% of a $74 billion market. However, the private prison model has always been criticized and faced public scrutiny related to the treatment of inmates and allegations that the government encouraged high occupancy rates when it awarded these contracts.

84.     After becoming an REIT, GEO was required to distribute at least 90% of its annual income as taxable dividends to shareholders. This allowed the Company to avoid corporate-level taxation. Consequently, GEO maintained limited funds with which to run its operations and had to rely on the capital markets to fund growth investments. Accordingly, GEO's continued success depended on lucrative financing deals with large banks like JPMorgan, WF, and BofA, which, in turn, required GEO to comply with a host of legal and regulatory requirements.

85.     To support these dividend payments and the Company's operating structure, GEO had to successfully maintain and operate its facilities in compliance with a host of contractual and regulatory requirements, while satisfying standards of due process and human rights. If GEO violated applicable regulations or otherwise infringed due process or human rights of prisoners or detainees, the Company could face extreme public scrutiny, bad publicity, lawsuits, and government investigations, which would almost certainly result in them losing lucrative government contracts and/or funding from the publicly-traded banks that are subject to extensive public and shareholder scrutiny. Indeed, multi-national banks like JPMorgan, BofA, and WF

26

would not do business with a private prison company that had violated federal regulations, and in particular human rights.

86.     If GEO lost its lucrative government contracts or funding from major banks, it risked its operations and ability to continue growing and being profitable. Indeed, without these contracts and loans, GEO's ability to continue operating as a REIT would be jeopardized as paying 90% of profits as dividends would be unsustainable.[4]

87.     Over the past two decades, dozens of lawsuits have been filed against the Company alleging, among other things, deficient medical care and exploitive labor practices.[5]

88.     At GEO's annual shareholder meeting in May 2019, a majority of shareholders passed a resolution demanding that the Company improve its reporting processes for human rights policies. Although GEO's Board told investors to vote against the resolution, the Company eventually issued a report in September 2019 stating how it would comply with the shareholders' demands. In November 2019, however, institutional shareholders, among others, claimed the report fell far short of expectations and failed to meet standards for human rights policies and processes, leaving the Company exposed to numerous legal, reputational, and financial risks.

89.     By this time, at least eight major financial institutions (including JPMorgan, BofA, WF, Suntrust, BNP, Fifth Third, Barclays and PNC) were refusing to loan to private prisons like GEO. These banks represented an estimated $2.35 billion, or 87.4%, of the credit lines and term loans that were central to private prisons' operations.

---

[4] Of course, if GEO's profits lowered, its dividends would be lower, and its share price would crash. Similar issues would occur if GEO exited its REIT structure.

[5] GEO Group/GEO Care Rapsheet, *Private Corrections Working Group*, available at https://www.privateci.org/rap_geo.html (last visited Oct. 11, 2021); GEO Group, *Project on Government Oversight*, available at https://www.contractormisconduct.org/contractors/253/geo-group (last visited Oct. 11, 2021).

90.     In October 2019, the California Public Employees Retirement System ("CalPERS"), the largest public pension fund in the U.S., announced that it was divesting all of its holdings in GEO. Following CalPERS' announcement, the California Faculty Association said, "[o]ur union was not going to stand by and watch our pension dollars support these terrible corporations, and we're pleased to see that CalPERS investment analysts have come to the conclusion."

**The COVID-19 Pandemic**

91.     In November 2019, weeks before the COVID-19 pandemic exploded across the globe, Defendant Zoley assured the market that "[t]he residential centers we manage on behalf of ICE are highly rated by national accreditation organizations and provide high-quality, culturally responsive services in safe and humane environment."

92.     On March 9, 2020 the Company received an information request about the policies and procedures it had "in place to prepare for and manage a potential spread of the novel coronavirus among federal prisoners in GEO's custody and among correctional staff at GEO facilities" from Senators Elizabeth Warren, Edward J. Markey, Brian Schatz, Cory A. Booker, Amy Klobuchar, Tammy Baldwin, Bernard Sanders, Richard Blumenthal, Jeffrey A. Merkley, Chris Van Hollen, Kamala D. Harris, Sherrod Brown, Mazie K. Hirono, Tina Smith and Mark R. Warner. The letter stated, among other things, that "incarcerated individuals 'are at special risk of infection, given their living situations,' and 'may also be less able to participate in proactive measures to keep themselves safe, and infection control is challenging in these settings.'"

93.     After being publicly notified of the "special risk" faced by incarcerated and detained individuals, GEO confirmed to Law360 that "no coronavirus cases ha[d] been detected" in any of its facilities and that it had "issued guidance to each of its facilities and updated its

policies to include preventing COVID-19." However, immigration attorneys stated that such "established protocols and detention standards may not be enough" in light of past "fail[ures] to manage other public health crises," as GEO well knew based on its robust track record of operational deficiencies, particularly in handling infectious diseases.6

94.     On April 13, 2020, detainees in the Company's Adelanto Facility filed a lawsuit seeking to reduce the facilities population to allow for social distancing. Kelvin Hernandez Roman et al. v. Chad F. Wolf et al., Case No. 5:20-cv-00768 (C.D Cal.). On April 23, 2020, a federal judge granted the preliminary injunction and ordered GEO to immediately reduce detainee population. (See Dkt. No. 55). The court also ordered the release of at least 100 detainees by April 27, and 150 more by April 30, and that the Company follow all measures recommended by the CDC, including that "[a]ll detainee common areas and share items…shall be cleaned and disinfected by a professionally trained cleaning staff with appropriate equipment and supplies on a regular basis whenever those common areas and shared items are accessible to detainees." Id.

95.     A similar lawsuit was also filed on April 13, 2020 by detainees in a GEO-operated Broward Transitional Center, alleging that the Company failed to comply with guidelines for preventing the spread of COVID-19 and seeking the release of a proposed class of vulnerable detainees. Gayle et al. v. Meade et al., Case No. 1:20-cv-21553, (S.D. Fl.). After ordering similar reductions in population, the court stated GEO "only partially complied with its own directives or CDC Guidelines" as it reduced populations by simply shuffling detainees around to other facilities through transfers conducted in unsanitary conditions and without proper COVID-19 screening, "paint[ing] a grim picture of an agency steeped in deliberate indifference."

---

6 Suzanne Monyak, *Attys Fear Coronavirus Spread In Immigration Detention*, Law360 (Mar. 11, 2020), available at https://www.law360.com/articles/1251570/attys-fear-coronavirus-spread-in-immigration-detention- (last visited Oct. 11, 2021).

96.     On April 14, 2020, detainees in the Company's Aurora Facility filed a lawsuit pressing the Court to release medically vulnerable detainees during the COVID-19 pandemic. Leaford Codner et al. v. Coate et al., 1:20-cv-01050 (D. Colo.). Within 24 hours of the filing, 8 of the 14 individuals claimed to be at high risk of contracting COVID-19 were released.

97.     On April 20, 2020, detainees in the GEO-operated Mesa Verde Detention Center (the "Mesa Verde Facility") filed a lawsuit in federal court alleging that the facilities were so crowded that social distancing was impossible and no meaningful steps had been taken to reduce the risk of COVID-19 outbreaks. Angel de Jesus Zepeda Rivas et al. v. David Jennings et al., Case No. 3:20-cv-02731 (C.D. Cal.). On June 9, 2020, the court ordered that the facilities "maintain, at a minimum, the status quo that currently exists as it relates to protection from transmission of Covid-19." (Dkt. No. 229). The Court further noted that "ICE's conduct and attitude towards its detainees at Mesa Verde [ ] since the pandemic began have shown beyond doubt that ICE cannot currently be trusted to prevent constitutional violations at these particular facilities without judicial intervention." Id. On August 6, 2020, the Court ordered the administration of, at minimum, weekly, rapid-result COVID-19 tests to all detainees at the Mesa Verde Facility, rejecting GEO and ICE's claims of insufficient testing supplies based on documentary evidence showing that they had avoided widespread testing out of "fear that positive test results would require them to implement safety measures." (Dkt. No. 500).

98.     On June 29, 2020, a complaint was filed in federal court alleging that GEO failed to abide by proper safety and health protocols at a federal halfway house in Houston, Texas.[7] The

---

[7] Keith Larsen, *Private Prison REIT Threatened Inmates for Reporting Covid-19 Concerns: Lawsuit*, THE REAL DEAL (July 6, 2020), available at https://therealdeal.com/2020/07/06/private-prison-reit-threatened-inmates-for-reporting-covid-19-concerns-lawsuit/ (last visited Oct. 11, 2021).

suit also alleged the facility threatened to discipline residents if they called county or city agencies for COVID-19 information, testing, or to inform them about any deaths at the facility. The complaint also stated that GEO had not reported three COVID-19 related deaths at the facility, was not complying with the CDC and BOP's guidance on social distancing or basic cleaning supplies, and was failing to provide basic medical care or to conduct screening of staff and/or residents for COVID-19.

99.     On July 13, 2020, Congress' Border Security, Facilitation & Operations Subcommittee held a hearing it titled "Oversight of ICE Detention Facilities: Examining ICE Contractors' Response to COVID-19." Chairwoman Kathleen Rice opened the hearing by remarking on concerns that ICE contractors (including GEO) had not responded appropriately to the COVID-19 outbreak. In her opening statement, Rice stated:

> Detention facilities must be held to a high standard at all times, but in this moment, it is of vital importance. ***And yet, over the past few months, it is clear that ICE and its contractors have not taken this outbreak seriously and have not treated it aggressively enough***. More than three thousand detainees, 280 contractors, and at least 45 ICE employees assigned to detention facilities have now tested positive for COVID-19. Sadly, we have lost at least two detainees and five contractors due to complications from the coronavirus after exposure at detention facilities. ***Despite these horrific losses, ICE is continuing normal operations and contractors are following in lock step***.

(Emphasis added).

100.    Individual Defendant Zoley testified at the hearing, and in his written statement admitted that by the first week of July, there had been 611 positive COVID cases in GEO's ICE facilities alone.

## False and Misleading Statements

101.    Throughout the Relevant Period, the Individual Defendants were aware or consciously disregarded that GEO's operational deficiencies and contractual and legal violations

would cost the Company access to capital after its publicly disclosed financing partners bailed and revenue streams from multiple major government contracts were terminated.

102.    The Individual Defendants were also aware or consciously disregarded that the lost financing partners and government contracts left GEO wholly unequipped to deal with COVID-19 in its facilities, which resulted in orders and guidelines from courts, governments, and regulatory agencies materially reducing prison populations, meaning significantly less revenue for the Company.

103.    On September 23, 2021, the court in the Securities Action denied the Securities Defendants' Motion to Dismiss in part and issued the Securities Action Opinion (see Dkt. No. 45), holding plaintiff's adequately alleged defendants' statements concerning pending lawsuits were false and misleading when made. (Id. at 22). The court stated:

> Defendants repeatedly made three statements about pending lawsuits: (1) the Company does not expect any pending claims or lawsuits to have a material adverse effect on its financial condition, results of operations, or cash flows; (2) the Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit; and (3) the Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.  The Company made a fourth statement during the February 14, 2019 earnings call: the Company has adequately accounted for known legal cases in our guidance for 2019.

> Plaintiffs have alleged that, in communications with ICE, Defendants characterized the lawsuits as a "potentially catastrophic risk" that exposed the Company to "tens of millions" in potential damages and up to $20 million in legal expenses.  Further, Plaintiffs have alleged that on May 30, 2018, in a letter to ICE, Zoley stated that "[w]e are deeply alarmed at the rapidly increasing costs in defending these lawsuits without reimbursement from ICE, or assistance in the defense by the Department of Justice (DOJ)."  Thus, Plaintiffs have adequately pled that these statements were false or misleading.

(*Id*. at 22-23). These false and misleading statements are further detailed below.

104.    On November 8, 2018, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2018

(the "3Q18 10-Q"). With respect to "Litigation, Claims and Assessments," the 3Q18 10-Q stated,

in relevant part:

> On October 22, 2014, former civil immigration detainees at the Aurora Immigration
> Detention Center filed a class action lawsuit against the Company in the United
> States District Court for the District of Colorado (the "Court"). The complaint alleges that the
> Company was in violation of the Colorado Minimum Wages of Workers Act and the
> federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that
> the Company was unjustly enriched as a result of the level of payment the detainees
> received for work performed at the facility, even though the voluntary work program
> as well as the wage rates and standards associated with the program that are at issue in
> the case are authorized by the Federal government under guidelines approved by the
> United States Congress. On July 6, 2015, the Court found that detainees were not
> employees under the Colorado Minimum Wage Order and dismissed this claim. In
> February 2017, the Court granted the plaintiff-class' motion for class certification
> which the Company appealed to the 10th Circuit Court of Appeals. On February 9,
> 2018, a three-judge panel of the appellate court affirmed the class-certification order.
> A petition for rehearing en banc was denied on March 7, 2018. On October 2, 2018,
> the U.S. Supreme Court denied the Company's petition for a writ of certiorari on the
> class certification order. The plaintiff class seeks actual damages, compensatory
> damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs,
> and such other relief as the Court may deem proper. In the time since the Colorado suit
> was initially filed, three similar lawsuits have been filed – two in Washington and one
> in California. In Washington, one of the two lawsuits was filed on September 9, 2017
> by immigration detainees against the Company in the U.S. District Court for the
> Western District of Washington. The second was filed on September 20, 2017 by the
> State Attorney General against the Company in the Superior Court of the State of
> Washington for Pierce County, which the Company removed to the U.S. District Court
> for the Western District of Washington on October 9, 2017. In California, a class-action
> lawsuit was filed on December 19, 2017 by immigration detainees against the
> Company in the U.S. District Court Eastern Division of the Central District of
> California. All three lawsuits allege violations of the respective state's minimum wage
> laws. However, the California lawsuit, like the Colorado suit, also includes claims
> based that the Company violated the TVPA and California's equivalent state statute.
> The Company intends to take all necessary steps to vigorously defend itself and has
> consistently refuted the allegations and claims in these lawsuits. ***The Company has not
> recorded an accrual relating to these matters at this time, as a loss is not considered
> probable nor reasonably estimable at this stage of the lawsuit.***
>
> The nature of the Company's business exposes it to various types of third-party legal
> claims or litigation against the Company, including, but not limited to, civil rights
> claims relating to conditions of confinement and/or mistreatment, sexual misconduct
> claims brought by prisoners or detainees, medical malpractice claims, product liability
> claims, intellectual property infringement claims, claims relating to employment
> matters (including, but not limited to, employment discrimination claims, union
> grievances and wage and hour claims), property loss claims, environmental claims,
> automobile liability claims, indemnification claims by its customers and other third

parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

105.   The statements referenced in ¶¶101-104 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and misleading because the Company misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses.

106.   On February 14, 2019, during the Company's fourth quarter 2018 ("4Q18") earnings call, CFO Evans stated, "[d]uring the fourth quarter, we recognized -- reorganized our legal representation and strategy with respect to certain legal cases and incurred one-time legal transition expenses. We believe, we have adequately accounted for known legal cases in our guidance for 2019." Evans' statement that GEO "adequately accounted for known legal cases" was materially false and/or misleading because he knowingly or recklessly misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses.

107.   On February 25, 2019, GEO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"). Under "Litigation, Claims and Assessments," the 2018 10-K stated:

34

As previously reported and described in our prior periodic reports, including most recently in our Form 10-Q for the quarter ended June 30, 2018, on February 8, 2017, former civil immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed — two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims based that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.***

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to***

*have a material adverse effect on its financial condition, results of operations or cash flows.*

108.     The statements referenced in ¶¶106-107 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and misleading because the Company misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses.

109.     On May 6, 2019, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q"). Under "Litigation, Claims and Assessments," the 1Q19 10-Q stated:

> As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-K for the year ended December 31, 2018, on February 8, 2017, former civil immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage

laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.***

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

110. The statements referenced in ¶109 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and misleading because the Company misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses.

111. On August 2, 2019, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "2Q19 10-Q"). Under "Litigation, Claims and Assessments," the 2Q19 10-Q stated:

As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-Q for the quarter ended March 31, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the

Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits. We establish accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. Our accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. We do not accrue for anticipated legal fees and costs, but expense those items as incurred.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims, medical malpractice claims, claims relating to the TVPA, product liability claims, intellectual property infringement claims, claims relating to employment laws (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products,

personnel, inmates or detainees, including damages arising from an escape or from a disturbance or riot at a facility. Expenses associated with legal proceedings may fluctuate from quarter to quarter based on the level of activity required during the different stages of legal proceedings, new developments that arise in the course of the legal proceedings, and the Company's litigation strategy. The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

112.    The statements referenced in ¶111  regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because the Company misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60).

113.    On November 7, 2019, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "3Q19 10-Q"). Under "Litigation, Claims and Assessments," the 3Q19 10-Q stated:

As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-Q for the quarter ended June 30, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff- class' motion for class certification on the TVPA and unjust enrichment claims. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in

Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of 48 the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. The two Washington cases are currently set for trial in March 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits. The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. Our accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. We do not accrue for anticipated legal fees and costs, but expense those items as incurred.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims, medical malpractice claims, claims relating to the TVPA, product liability claims, intellectual property infringement claims, claims relating to employment laws (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel, inmates or detainees, including damages arising from an escape or from a disturbance or riot at a facility. Expenses associated with legal proceedings may

fluctuate from quarter to quarter based on the level of activity required during the different stages of legal proceedings, new developments that arise in the course of the legal proceedings, and the Company's litigation strategy. The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

114.    The statements referenced in ¶113 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because the Company misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses.

115.    On February 26, 2020, GEO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter ended December 31, 2019 (the "2019 10-K"). Under "Litigation, Claims and Assessments," the 2019 10-K stated:

As previously reported and described in the Company's prior periodic reports, including most recently in its Form 10-Q for the quarter ended September 30, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff- class' motion for class certification on the TVPA and unjust enrichment claims. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S.

District Court for the Western District of Washington. The second lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. The two Washington cases are currently set for trial in April 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits. The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. The Company does not accrue for anticipated legal fees and costs but expenses those items as incurred.

On December 30, 2019, GEO filed a lawsuit for declaratory and injunctive relief challenging California's newly enacted law - Assembly Bill 32 (AB-32) - which bars the federal government from engaging GEO or any other government contractors to provide detention services for illegal aliens. GEO's claims, as described in the lawsuit, are grounded in authoritative legal doctrine that under the Constitution's Supremacy Clause, the federal government is free from regulation by any state. By prohibiting federal detention facilities in California, the lawsuit argues AB-32 substantially interferes with the ability of USMS and ICE to carry out detention responsibilities for the federal government. Secondly, because AB-32 creates exceptions to the State when using GEO or any government contractors (to alleviate overcrowding), California's statute unlawfully discriminates against the federal government. On December 31, 2019, GEO filed its motion for a preliminary injunction restraining California's

Governor and Attorney General from enforcing AB-32 against GEO's detention facilities on behalf of USMS and ICE.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.***

116.    The statements referenced in ¶115  regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and misleading because the Company misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses. The statements also failed to disclose that if forced to close its facilities by AB-32, GEO "would lose an average of $250 million a year in revenue over the next 15 years, plus the $300 million invested in acquiring and setting up those buildings."

117.    On May 6, 2020, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 10-Q"). Under "Litigation, Claims and Assessments," the 1Q20 10-Q stated:

As previously reported and described in the Company's prior periodic reports, including most recently in its Form 10-K for the year ended December 31, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the

federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification on the TVPA and unjust enrichment claims. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class- action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. Trial for the two Washington cases has been continued until sometime past June 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.*** The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. The Company does not accrue for anticipated legal fees and costs but expenses those items as incurred.

On December 30, 2019, GEO filed a lawsuit for declaratory and injunctive relief challenging California's newly enacted law - Assembly Bill 32 (AB-32) - which bars the federal government from engaging GEO or any other government contractors to provide detention services for illegal aliens. GEO's claims, as described in the lawsuit, are grounded in authoritative legal doctrine that under the Constitution's Supremacy Clause, the federal government is free from regulation by any state. By prohibiting federal detention facilities in California, the lawsuit argues AB-32 substantially interferes with the ability of U.S. Marshals Service ("USMS") and ICE to carry out detention responsibilities for the federal government. Secondly, because AB-32 creates exceptions to the State when using GEO or any government contractors (to alleviate overcrowding), California's statute unlawfully discriminates against the federal government. On December 31, 2019, GEO filed its motion for a preliminary injunction restraining California's Governor and Attorney General from enforcing AB-32 against GEO's detention facilities on behalf of USMS and ICE. The court granted the parties' joint motion to reschedule the hearing to July 16, 2020.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.***

118.     The statements referenced in ¶117 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because the Company misrepresented and failed to disclose that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses. The statements also failed to disclose that if forced to close its

facilities by AB-32, GEO "would lose an average of $250 million a year in revenue over the next 15 years, plus the $300 million invested in acquiring and setting up those buildings."

119.    The Securities Defendants' material misstatements and omissions, as alleged above, were made intentionally, knowingly, and/or with deliberate recklessness. Those material misstatements and omissions had the purpose and effect of concealing the adverse truth about GEO's true operations, performance, finances, and prospects from the investing public, consequently buoying and artificially inflating the trading price of GEO's common stock. Members of the Board made and permitted others to make these materially false and misleading statements and omissions, which has significantly harmed the Company.

120.    That these statements were (a) made intentionally, knowingly, and/or with deliberate recklessness; and (b) known by the Board is supported by the following:

a.  During the Relevant Period, Senator Elizabeth Warren wrote a letter accusing GEO executives, including the Securities Defendants, of having direct knowledge of, while misrepresenting to investors, the financial issues arising from the operational deficiencies and increasing scrutiny faced by GEO. Senator Warren's letter stated in part that, "[d]espite significant ongoing legal concerns, GEO has made a series of public statements through earnings calls and filings with the Securities and Exchange Commission (SEC) that differ dramatically from the non-public communications by corporate executives."

b.  The heightened scrutiny from the highest levels of the United States government, which included:

    i.   Refusal by every major Democratic candidate for Florida governor to accept GEO's money in 2018;

    ii.  The Florida Democratic Party's banning of all donations from private-prison firms in 2018;

    iii. The March 12, 2019 questions by Congresswoman Ocasio-Cortez regarding the bank's financing of private prison companies like GEO;

    iv.  The May 2019 bill by Congressman Crow to require immigration detention facilities, including all operated by GEO, to comply with site inspection requests from members of Congress within 48 hours;

46

     v.   The May and June 2019 reports by the DHS OIG regarding unsafe and unhealthy conditions at multiple GEO facilities;

    vi.   The July 2019 letter from Senator Warren to the SEC Chairman;

   vii.   The July 2019 letter from the House Oversight and Reform Committee demanding documents and communications pertaining to government contracts, amid reports of the deplorable treatment of migrants at the southern border;

  viii.   The October 2019 law AB-32 enacted in California barring the federal government from "enter[ing] into a contract with a private, for-profit prison facility located in or outside the state"; and

    ix.   The March 9, 2020, Senators' Letter requesting information from GEO about its ability to respond to COVID-19;

c.   Defendant Zoley's direct letter to ICE on May 30, 2018, which stated: "[w]e are deeply alarmed at the rapidly increasing costs in defending these lawsuits without reimbursement from ICE, or assistance in their defense by the Department of Justice (DOJ)."

d.   The letter from fifteen U.S. senators on March 9, 2020, which confirms that the Securities Defendants were aware of the material issues arising from GEO facilities' preparations and abilities to protect their wards during the COVID-19 pandemic.

e.   GEO's response to U.S. senators' letter on March 12, 2020, which stated it was "fully aware of the emerging health concerns presented by COVID-19" and emphasized GEO's purported "long-standing history of providing safe, secure, and humane conditions at all of its facilities."

f.   Zoley's testimony before Congress' Border Security, Facilitation & Operations Subcommittee at a hearing titled "Oversight of ICE Detention Facilities: Examining ICE Contractors' Response to COVID-19," during which he testified about whether GEO was properly responding to the COVID-19 outbreak and other topics reflecting direct knowledge of the false and misleading statements.

g.   Among other statements, Zoley told investors in 2019 that "a false narrative and deliberate mischaracterization of our long-standing role as a quality service provider to ICE" were driving "the recent media stories regarding overcrowded border patrol facilities and financial institutions discontinuing future financial support for private operators of ICE Processing Centers." CFO Evans also repeatedly assured investors that GEO's cash flows were "stable," "sustainable," and "predictable," attributed heightened scrutiny on GEO to "a mischaracterization of our role as a service provider and our overall Company record," and conveyed that there was "misinformation regarding our banking partners and our access to capital."  These comments and others indicate that the Securities Defendants had knowledge or recklessly disregarded the accuracy of GEO's operations, public scrutiny, ability to address COVID-19 and, in turn, the stability and predictability of cash flows and dividend amount.

h.   Shareholders raised their concerns over the operational deficiencies to GEO's Board and executives, including Zoley, indicating the Company had direct knowledge of the violations giving rise to public scrutiny, loss of lenders, loss of contracts, and instability with cash flows and dividends. In July 2018, CalSTRS conducted an investigation and, by November 2018, voted to remove all of its holdings from GEO. GEO issued a September 2019 report on the conditions in its facilities and operational issues, further supporting direct knowledge of the false and misleading statements alleged herein.

**The Truth Begins to Emerge**

121.   On March 5, 2019, Reuters published an article titled, "JPMorgan Backs Away from Private Prison Finance," which reported that "JPMorgan Chase & Co has decided to stop financing private operators of prisons and detention centers, which have become targets of protests over Trump administration policies."

122.   The same day, Bloomberg published an article entitled, "JPMorgan Ends Financing of Private Prisons After Criticism," announcing that as part of JPMorgan's "robust and well-established process to evaluate the sectors that [it] serve[s]," it would "no longer bank the private prison-industry," including GEO.

123.   On March 10, 2019, the Washington Post reported that U.S. Bank had reduced its credit exposure to GEO to "an immaterial amount."

124.   As a result of these revelations, on March 8, 2019, GEO's share price fell over 11%, or $2.58 per share, to close at $20.35 per share after three days of heavy trading, and another 5.0%, or $1.03 per share, to close at $19.43 per share on March 14, 2019 after two days of heavy trading.

125.   On March 15, 2019, Forbes reported that, "[t]he stocks of private prison leaders GEO Group and CoreCivic are down 16% and 8%, respectively today since last Tuesday — the day when the country's largest bank, JPMorgan, publicly announced that they will take their money out of the private prison industry."

126.     On July 11, 2019, NBC News published an article titled, "House Democrats seek documents from for-profit companies detaining migrants." Following this news, GEO's share price fell over 6.5%, or $1.33 per share, to close at $18.97 per share on July 11, 2019.

127.     On July 17, 2019, it was reported that GEO plead to ICE to help cover litigation costs, stating in relevant part, "GEO cannot bear the costs of this defense on its own" and "[w]e urgently implore DOJ to take over the defense of these lawsuits and reimburse GEO for its costs." Following this news, GEO's share price fell over 7.9%, or $1.48 per share, to close at $17.24 per share on July 19, 2019.

128.     On March 9, 2020, fifteen U.S. senators sent a request for information to GEO about the policies and procedures it had "in place to prepare for and manage a potential spread of the novel coronavirus among federal prisoners in GEO's custody and among correctional staff at GEO facilities." Quoting a March 2, 2020 open letter signed by over 450 public health and legal experts and organizations, the letter stated that "incarcerated individuals 'are at special risk of infection, given their living situations,' and 'may also be less able to participate in proactive measures to keep themselves safe, and infection control is challenging in these settings.'"

129.     The next day, March 10, 2020, the Philadelphia Inquirer reported that after two decades of operating Pennsylvania's only privatized county prison, GEO proposed December 31, 2020 as the termination date of its current five-year, $259 million contract with the state. GEO's request came after Delaware County voted to commission a study on what was needed to transition the Delaware County Prison back to being publicly run.

130.     The March 9 and 10, 2020 revelations caused the Company's share price to plummet over 29% on March 11, 2020, after two days of heavy trading.

131.    On June 17, 2020, CoreCivic announced that its Board of Directors was reevaluating its "corporate structure and capital allocation alternatives" and "suspend[ing] the Company's quarterly dividend." The revelation suggested that GEO likely would also suspend or at least cut its dividend.

132.    The same day, the Intercept published an article titled, "GEO Group's Blundering Response to the Pandemic Helped Spread Coronavirus in Halfway Houses[,]" which reported details of a significant COVID-19 outbreak at one of the Company's halfway houses in Kansas. The article noted the facility "was for weeks the hardest hit federal halfway house in the country" in terms of confirmed COVID-19 cases and, citing interviews with residents, reported "that the virus spread not in spite of the facility's efforts to contain it, but because of it" and that GEO's "blundering" response included keeping residents in overcrowded conditions without enforcing personal protective measures even as COVID-19 diagnoses at the facility increased.

133.    Following this news, the Company's stock price fell over 10%, or $1.37 per share, to close at $11.83 per share on June 19, 2020 after two days of heavy trading.

134.    On July 16, 2020, the LA Times reported that a federal court largely upheld California's ban on private prison contracts, concluding the ban "does not unconstitutionally discriminate against the federal government or its contractors." GEO claimed that if forced to close its facilities, "it would lose an average of $250 million a year in revenue over the next 15 years, plus the $300 million invested in acquiring and setting up those buildings."

135.    Following this news, GEO's stock price fell over 5.4% or $0.66 per share, to close at $11.49 per share on July 17, 2020 after two days of heavy trading.

136.    On August 6, 2020, it was widely reported that a federal court had ordered GEO and ICE to conduct weekly, rapid-result COVID-19 tests at the Mesa Verde Facility and found

that authorities had shown "deliberate indifference to the risk of an outbreak" of COVID-19 over their arguments regarding insufficient testing supplies. The court further noted that authorities had "avoided widespread testing . . . not for lack of tests, but for fear that positive test results would require them to implement safety measures that they apparently felt were not worth the trouble."

137.    The full truth was not revealed until August 6, 2020, when GEO announced a nearly 30% reduction in its quarterly dividend from $0.48 per share to $0.34 per share – just enough to allow GEO to remain structured as a publicly traded REIT. On this news GEO's stock price fell $0.77 per share, or nearly 7%, to close at $10.67 per share on August 7, 2020.

## DAMAGE TO GEO

138.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending and paying class-wide damages in the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

## DERIVATIVE ALLEGATIONS

139.    Plaintiff brings this action derivatively for the benefit of GEO to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

140.    Plaintiff will adequately and fairly represent the interests of GEO and its stockholders in enforcing and prosecuting its rights.

141.    Plaintiff has been a continuous holder of GEO common stock since February 2018.

142.    On January 25, 2021, Plaintiff sent the Demand to the Board, asserting that it investigate the wrongdoing set forth herein and take appropriate action, including commencing

litigation against current and former officers and directors.8   Pursuant to the Florida statute, Plaintiff may bring a derivative action 90 days after the Demand was sent.

143.    On February 3, 2021, GEO's counsel wrote the GEO Letter to Plaintiff's counsel, confirming receipt of the Demand and they would provide a response following review of the Demand.9

144.    On April 19, 2021, GEO's counsel wrote a response to Plaintiff's counsel, that its counsel would not consider the Demand because the issues in the Demand are the subject of a the Securities Action ( the "GEO Response").10 As such, Plaintiff has not received a substantive response to the Demand or date on which the purported investigation would be completed even though the court has allowed the Securities Action to proceed. Accordingly, as further detailed herein, demand in this case was refused.

<u>**COUNT I**</u>
**Violations of § 10(b) of the Exchange Act and Rule 10b-5**
**Against the Individual Defendants**

145.    Plaintiff hereby incorporates the allegations in paragraphs 1 through 144 as if fully set forth herein.

146.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

147.    During the Relevant Period, the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and

---

8 A true and complete copy of the Demand is attached hereto as Exhibit A.
9 A true and complete copy of the GEO Letter is attached hereto as Exhibit B.
10 A true and complete copy of the GEO Response is attached hereto as Exhibit C.

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

148.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of GEO common stock during the Relevant Period.

149.    The Individual Defendants acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of GEO were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

150.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of GEO, their control over, and/or receipt and/or modification of GEO's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning GEO, participated in the fraudulent scheme alleged herein.

151.    As a result of the foregoing, the market price of GEO common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the Securities Defendants' statements, stockholders relied on the statements described above and/or the integrity of the market price of GEO common stock during the Relevant Period in purchasing GEO common stock at prices that were artificially inflated as a result of these false and misleading statements.

152.     As a result of the wrongful conduct alleged herein, the Company has suffered significant damages.

## COUNT II
### Breach of Fiduciary Duty
### Against the Individual Defendants

153.     Plaintiff hereby incorporates the allegations in the foregoing paragraphs 1 through 144 as if fully set forth herein.

154.     The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

155.     Moreover, the Individual Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

156.     The Individual Defendants further breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

157.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GEO has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

158.     Plaintiff has no adequate remedy at law.

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty
### Against the Individual Defendants

159.     Plaintiff hereby incorporates the allegations in paragraphs 1 through 144 as if fully set forth herein.

160.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

161.    Plaintiff has no adequate remedy at law.

## COUNT IV
### Unjust Enrichment
### Against the Individual Defendants

162.    Plaintiff hereby incorporates the allegations in paragraphs 1 through 144 as if fully set forth herein.

163.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GEO.

164.    The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to GEO.

165.    Plaintiff, as a shareholder and representative of GEO, seeks restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants proceeds from their misconduct, and/or an order requiring defendants to disgorge all profits, benefits, and other compensation obtained through, or as a result of, their wrongful conduct and fiduciary breaches.

166.    As a direct and proximate result of defendants' misconduct, the Company has suffered significant damages, as alleged herein.

167.    Plaintiff has no adequate remedy at law.

## COUNT V
### Waste of Corporate Assets
### Against the Individual Defendants

168.    Plaintiff hereby incorporates the allegations in paragraphs 1 through 144 as if fully set forth herein.

169.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of GEO's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

170.    The Individual Defendants wasted corporate assets by: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

171.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

172.    As a direct and proximate result of defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

173.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

Dated: November 12, 2021                    Barker & Cook, P.A.

                                            By: */s/ Chris A. Barker*
                                            Chris A. Barker, Esquire
                                            Florida Bar No. 885568
                                            William J. Cook, Esquire
                                            Florida Bar No. 986194
                                            501 East Kennedy Boulevard, Suite 1040
                                            Tampa, Florida 33602
                                            Telephone:     813/489-1001
                                            Facsimile:     813/489-1008
                                            Local Counsel for Plaintiff

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
sdr@rl-legal.com
vl@rl-legal.com

**MOORE KUEHN, PLLC**
Justin A. Kuehn
Fletcher W. Moore
30 Wall Street, 8th Floor
New York, NY 10005
jkuehn@moorekuehn.com
fmoore@moorekuehn.com
(212) 709-8245
*Attorneys for Plaintiff*